IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SHEILA MARIE STIDHAM,

    Plaintiff,

v.                                                        Case No. 2:13-CV-2277-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

    Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Sheila Marie Stidham ("Plaintiff") seeks review of a final decision by Defendant, the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. In her pleadings, Plaintiff alleges error with regard to the Commissioner's assessment of her residual functional capacity and the opinions of her treating and consulting physicians. Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record. As such, the decision of the Commissioner is affirmed.

**I.    Factual and Procedural Background**

Plaintiff's mental health issues date back to December 2008 when Plaintiff first saw nurse practitioner Robin Tucker, ARNP ("Tucker") at the Wyandot Center complaining of anxiety. Plaintiff indicated that she had recently been through several traumatic life events, including the death of several family members and friends and the father of her middle child. She reportedly had no energy or ability to concentrate and described feelings of worthlessness,

1

helplessness, hopelessness, and anhedonia. Tucker's evaluation revealed that Plaintiff was alert and oriented to person, place, time, and situation and her memory was intact. She was diagnosed with panic disorder with agoraphobia and was prescribed anti-depressants.

Plaintiff returned to the Wyandot Center multiple times over the next three years. While she often saw Tucker, there were numerous times when Plaintiff saw other treating staff. Her evaluations varied wildly, often dependent upon whether Plaintiff was taking her medication. For example, on February 9, 2009, Plaintiff reported that she was feeling good and that the medication was helpful. However, by April 21, 2009, Plaintiff stated that she was only taking her medication three times per week. By the end of June 2009, her anxiety had returned full-force and Plaintiff reported that she had been out of medication for two weeks. On August 28, 2009, Plaintiff stated that she had not been taking her medication because she did not feel depressed, but admitted to using a friend's Xanax. In January 2010, Plaintiff rated her anxiety and depression as a nine out of a possible ten, but by February 2010, she rated her issues as a five and four out of ten, respectively.

On April 17, 2010, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Charles Fantz, PhD ("Dr. Fantz"). Dr. Fantz determined that Plaintiff was moderately limited in her ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) interact appropriately with the general public. Simultaneous to this assessment, Dr. Fantz conducted a Psychiatric Review Technique. He diagnosed Plaintiff with anxiety, as evidenced by the following symptoms: (1) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; and (2) recurrent severe panic attacks manifested

by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week.

On July 14, 2011, Tucker completed a Mental Impairment Questionnaire on behalf of Plaintiff. Tucker noted that Plaintiff suffered from emotional lability, decreased energy, and generalized persistent anxiety. When asked to rate Plaintiff's functional limitations, Tucker indicated that Plaintiff suffered from either moderate or marked restriction of activities of daily living and maintaining social functioning. Plaintiff also displayed marked deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner. Finally, Tucker reported that Plaintiff had suffered at least one, if not more, episode of decompensation. However, Tucker did not find that Plaintiff had low or reduced intellectual functioning.

Plaintiff's last visit to the Wyandot Center occurred on November 2, 2011. At this appointment, Plaintiff indicated that she had once again stopped taking her medication because she was not depressed. However, on November 23, 2011, Plaintiff called the Center requesting a refill of Valium. When staff noted that Plaintiff had just filled a prescription for 120 pills on October 21, 2011, Plaintiff indicated that she had run out because she had been taking more than what was prescribed. Plaintiff later notified the Center that she had found a new, un-used bottle of medication. At the time of her last appointment, Plaintiff's diagnosis remained unchanged: panic disorder with agoraphobia.

With regard to her physical health issues, Plaintiff was diagnosed with hepatitis C, type IIA, in July 2010. A liver biopsy showed some minor injury. Plaintiff's physician, Dr. Joseph W. Barry, MD ("Dr. Barry") recommended Plaintiff undergo a 24-week course of treatment. Plaintiff returned to Dr. Barry in December 2011, at which time Dr. Barry noted that Plaintiff

had some degree of pain, discomfort, and distention in her upper right quadrant and had put on some weight.  During an exam in January 2012, Dr. Barry noted that Plaintiff had a palpable liver edge but her pathology was negative for cirrhosis.

Plaintiff filed for SSI on March 1, 2010, alleging disability beginning February 1, 2007.  Her claim was denied initially on August 31, 2010, and upon reconsideration on January 27, 2011.  Plaintiff timely filed a request for an administrative hearing, which took place on January 30, 2012, before Administrative Law Judge John Kays ("ALJ Kays").  Plaintiff, represented by counsel, appeared and testified.  Also testifying was Vocational Expert Kelly Wynn ("VE Wynn").

At the time of the hearing, Plaintiff was a thirty-year-old mother of three and was residing with her boyfriend.  Plaintiff testified that she last worked as a food preparer for Honey Baked Farms in February 2005[1] and left that position because of complications with her last pregnancy.  When asked why she could not return to work, Plaintiff stated "I'm always in pain, I'm always tired.  My anxiety gets the best of me.  I have mood swings very often." Dkt. 9-1, at 32.  Plaintiff indicated that she had been diagnosed with hepatitis C and that she was getting ready to start treatment.  Plaintiff also testified that she was depressed and afraid of dying.  She experienced frequent crying spells and racing thoughts.

In describing her activities of daily living, Plaintiff indicated that she mostly lies on the couch and watches television.  She stated that she takes a shower once or twice a week and relies on her boyfriend and thirteen-year-old son to help her around the house.  Plaintiff indicated that she usually buys only food that her children can cook in the microwave because she does not

---

[1] During her testimony, Plaintiff testified that she stopped working on February 1, 2005. Dkt. 9-1, at 29. However, it appears that this date, as written, is a typographical error, as all other accounts of Plaintiff's last worked date state it to be February 1, 2007.

cook. She rarely leaves the house and when she does it is usually to go to her father's house, which is down the street. Plaintiff stated that she also suffers from daily headaches and cannot stand on her feet longer than three minutes due to a "messed up" ankle. Dkt. 9-1, at 37.

In addition to Plaintiff's testimony, ALJ Kays also sought the testimony of VE Wynn to determine how, if at all, Plaintiff's impairments and limitations affected her ability to return to the workforce. VE Wynn described Plaintiff's past work as a cashier/checker and as a food assembler/kitchen as semiskilled and light. Based upon Plaintiff's testimony and his own review of the entire record, ALJ Kays asked the VE a series of hypothetical questions that included varying degrees of limitation on complexity of tasks, stressful situations, and attendance. Although the VE indicated that, with the restrictions as set forth by the ALJ, the hypothetical individual could not perform Plaintiff's past relevant work, she stated that there was other work in the national economy that an individual with such limitations could perform. During cross-examination, Plaintiff's counsel questioned whether, in addition to the limitations set forth by the ALJ, the hypothetical individual could perform other work if her problems with concentration, persistence, and pace resulted in a failure to complete tasks in a timely manner up to one-third of the time. The VE responded in the negative.

ALJ Kays issued his decision on February 10, 2012, finding that Plaintiff suffered from a variety of severe impairments including hepatitis C, anxiety disorder, and substance dependence in remission. Despite these findings, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. ALJ Kays concluded that Plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations: (1) only moderately complex tasks with four to

five-step instructions in a habituated setting, and (2) no highly stressful jobs with high production quotas, rapid assembly, or intense personal interaction. The ALJ therefore concluded that Plaintiff had not been under a disability, as that term is defined in the Social Security Act, since March 1, 2010, the date the application was filed.

On June 7, 2013, Plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration. Given Plaintiff's exhaustion of all administrative remedies, her claim is now ripe for review.

## II.     Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is

6

expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).  This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).  The steps are designed to be followed in order.  If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751). The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084. The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.     Analysis

In her pleadings, Plaintiff alleges that the ALJ erred by improperly evaluating the opinion evidence of record and thus failed to properly assess Plaintiff's residual functional capacity. More specifically, Plaintiff argues that ALJ Kays: (1) failed to discuss and assign appropriate weight to the opinion of Plaintiff's treating nurse practitioner, Tucker; and (2) erred by assigning controlling weight to Dr. Fantz, the non-examining, consultative state examiner. Plaintiff's arguments fail.

**A.     Residual Functional Capacity Generally**

"[R]esidual functional capacity consists of those activities that a claimant can still perform on a regular and continuing basis despite his or her physical limitations." *White v. Barnhart*, 287 F.3d 903, 906 n.2 (10th Cir. 2001). A residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p, 1996 SSR LEXIS 5, at *19 (July 2, 1996). The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the

maximum amount of work-related activity the individual can perform based on evidence contained in the case record. *Id*. The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*. However, there is "no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

**B.     Treating Nurse Practitioner**

Plaintiff first argues that the ALJ failed to properly assess her residual functional capacity because the ALJ inappropriately discounted the opinion evidence of Plaintiff's treating nurse practitioner, Tucker. A thorough review of the ALJ's written decision reveals that, while ALJ Kays cited to Tucker's reports and findings several times throughout his decision, the ALJ did not specifically mention Tucker by name, nor did he assign her opinion any particular weight.

As a general rule, "the Commissioner may use evidence from 'other medical sources' such as nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists, none of which are on the list of 'acceptable medical sources,' to show the severity of [a] plaintiff's impairments and how they affect [her] ability to work." *Dixon v. Astrue*, 2011 U.S. Dist. LEXIS 37518, at *10 (D. Kan. Apr. 6, 2011) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)). Recognizing that an increasing number of claimants receive their medical care by these types of health care providers, the Commissioner promulgated Social Security Ruling 06-03p which states, in relevant part:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically

> deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

SSR 06-03p, 2006 SSR LEXIS 5, at *8 (2006).

The Ruling further explains that a disability "adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 2006 SSR LEXIS 5, at *6; *see also Bowman*, 511 F.3d at 1274 (noting that SSR 06-03p requires an ALJ to evaluate medical opinions from providers who are not deemed "acceptable medical sources" and explain the weight given to them). The ruling also provides a list of factors that an ALJ should consider in his analysis of these "other sources," including: (1) how long the source has known and how frequently the source has seen the individual, (2) how consistent the opinion is with other evidence, (3) the degree to which the source presents relevant evidence to support an opinion, (4) how well the source explains the opinion, (5) whether the source has a specialty or area of expertise related to the individual's impairment(s), and (6) any other factors that tend to support or refute the opinion. 2006 SSR LEXIS 5, at *11. Importantly, the Ruling also provides that "[n]ot every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." *Id*. at *13.

Plaintiff naturally focuses on the portion of SSR 06-03p that requires the ALJ to generally *explain* the weight given to opinions from these other sources. In contrast, the Commissioner argues that the ALJ does not have to explain and/or give any weight to such an opinion if the ALJ's decision allows the claimant or subsequent adjudicator to otherwise follow

the ALJ's reasoning. The Commissioner alleges that the ALJ's failure to include Tucker's opinion in his written decision is statement enough; in other words, Tucker's findings were so inapposite to the evidence contained in the balance of the record that it was not even necessary to mention them.

There is no doubt that ALJ Kays could have been more explicit in his rejection of Tucker's opinion. However, the ALJ's findings are grounded in substantial evidence and are sufficiently specific for this court's review. The Tenth Circuit has held that "[w]here . . . we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

In her medical impairment questionnaire, Tucker opined that Plaintiff suffered from emotional lability, decreased energy, and generalized persistent anxiety. Dkt. 9-1, at 319. She also assigned Plaintiff a Global Assessment of Functioning ("GAF") score of sixty,[2] indicating only moderate symptoms. Indeed, a score of sixty-one would have indicated some *mild* symptoms. DSM-IV, at 34. When assessing the degree to which certain functional limitations existed as a result of Plaintiff's mental impairments, Tucker indicated that Plaintiff had both moderate and marked restrictions on activities of daily living and maintaining social functioning. Dkt. 9-1, at 320. Tucker did not provide any explanation as to the discrepancy. Furthermore, Tucker indicated that Plaintiff had suffered at least one, if not more episodes of deterioration or decompensation which would cause Plaintiff to withdraw from a particular situation or experience an exacerbation of signs and symptoms. Dkt. 9-1, at 320. However, in Tucker's own

---

[2] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), at 32. A FAG score of 51-60 indicates "moderate symptoms, such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id*. at 34.

notes, she reported that Plaintiff only really suffered relapses or episodes when she went off her medication.  Furthermore, neither Tucker nor any other medical professional ever classified Plaintiff's periods of non-medication compliance as episodes of decompensation.  Additionally, on this same questionnaire, Tucker indicated that she did not know how often, during a typical workday, Plaintiff's symptoms would be severe enough to interfere with the attention and concentration necessary to perform even simple work tasks.  Dkt. 9-1, at 321.  Nor did she have any idea as to how many "good days" and "bad days" Plaintiff's impairments were likely to produce.  Dkt. 9-1, at 321.

Moreover, Tucker's conclusions simply do not square with the balance of Plaintiff's medical record.  As stated above, Plaintiff repeatedly went through phases where her symptoms got worse.  However, these phases always seemed to be connected to Plaintiff's failure to take her medications as prescribed.  In reviewing her medical records, state examiner Dr. Fantz acknowledged Plaintiff's anxiety but found that she was only moderately limited in three out of twenty assessed areas.  Dkt. 9-1, at 243-44.  Dr. Fantz further concluded that Plaintiff "had the capacity to adapt to most work situations that do not require extensive independent planning and goal setting."  Dkt. 9-1, at 245.  Finally, Plaintiff stopped working in 2007 due to, by her own testimony, complications with her last pregnancy, not because of any of her current impairments. Dkt. 9-1, at 29-30.  This testimony suggests that Plaintiff's unemployment may be unrelated to her current alleged medical conditions.

However, even if ALJ Kays did commit error by failing to discuss and specifically weight the opinion of Tucker, such error is harmless.  As a general rule, when an ALJ fails to assign particular weight to the opinion of a *treating* physician, "remand is required." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  In other circumstances, however, the failure to

address and weigh all opinions is subject to a harmless error analysis. *See Keyes-Zachary*, 695 F.3d at 1161-63. "When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's [residual functional capacity], the need for express analysis is weakened." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). "Consequently, absent inconsistencies between or among the medical opinions and the ALJ's [residual functional capacity] determination, any error in considering the opinions is harmless." *Rischer v. Colvin*, 2014 U.S. Dist. LEXIS 99109, at *37 (D. Kan. July 22, 2014) (citing *Keyes-Zachary*, 695 F.3d at 1161-62). And, where inconsistencies *do* exist, as is the case here, the court may

> supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstances, i.e. where, based on material the ALJ did at least consider (just not properly), [the court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Here, based on the balance of Plaintiff's record, it is clear that ALJ Kays' decision was based on substantial evidence. The ALJ noted that he made his decision only after "careful consideration of the entire record." Dkt. 9-1, at 14. The Tenth Circuit's general practice "is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (citing *United States v. Kelley*, 359 F.3d 1302, 1304-05 (10th Cir. 2004)). As such, Plaintiff's first assignment of error fails.

**C.     Consultative Examiner**

Plaintiff next argues that the ALJ erred by assigning the opinion of Dr. Fantz, the non-examining state examiner, controlling weight. She specifically argues that not only was Dr. Fantz's opinion not entitled to controlling weight, given his status as a consultative examiner, but also that his opinion was rendered before the balance of Plaintiff's medical record even existed.

Plaintiff alleges that had Dr. Fantz reviewed the evidence provided by Plaintiff's treating sources at the Wyandot Center, "it is reasonable to assume that his ultimate conclusions might have been vastly different." Dkt. 12, at 11-12. The court disagrees.

As a general rule, "[t]he opinions of physicians, psychologists, or psychiatrists who have seen a claimant over a period of time for purposes of treatment are given more weight than the views of consulting physicians or those who only review the medical records and never examine the claimant." *Romero v. Colvin*, 2014 U.S. Dist. LEXIS 39984, at *7 (D. Kan. Mar. 26, 2014) (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004)). "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Id*. "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it." *Id*. at *7-8 (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)).

State examiner Dr. Fantz conducted both a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique on Plaintiff on April 17, 2010. In his Assessment, Dr. Fantz concluded that Plaintiff was moderately limited in her ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) interact appropriately with the general public. Dkt. 9-1, at 243-44. Based on this assessment, Dr. Fantz opined that Plaintiff: (1) has the ability to understand and remember simple and intermediate level instructions; (2) has the ability to focus and persist at simple routine and intermediate level tasks for an eight-hour day; (3) has social skills for minimal social interaction, but could not deal with the public on a sustained basis; and (4) has the capacity to adapt to most work situations that do not require extensive independent planning and goal setting. Dkt. 9-1, at

245. In his Psychiatric Review Technique, which was rendered based on his review of Plaintiff's medical records, Dr. Fantz determined that Plaintiff suffered from anxiety that involved a persistent irrational fear of a specific object, activity or situation and recurrent severe panic attacks. Dkt. 9-1, at 252. The examiner therefore concluded that Plaintiff would have moderate difficulties in maintaining social functioning, concentration, persistence, and pace. Dkt. 9-1, at 257. Based on this court's review, Dr. Fantz's opinions are in line with the balance of Plaintiff's medical record.

First and foremost, the court notes that ALJ Kays did not assign Dr. Fantz's opinion "controlling" weight, as Plaintiff would have it believe. Rather, the ALJ assigned the state examiner's opinion *significant* weight, an action well within the Social Security Regulations. This is true despite the fact that Dr. Fantz examined Plaintiff's medical records in April 2010, more than a year before Plaintiff stopped treatment at the Wyandot Center. While Plaintiff reported ongoing mental health issues and symptoms after Dr. Fantz rendered his opinion, she also reported during this time that her issues and symptoms got better when she was consistently taking her medications as prescribed. Plaintiff argues that, had Dr. Fantz had the benefit of these additional records, "it is reasonable to assume that his ultimate conclusions might have been vastly different." Dkt. 12, at 11-12. The court will not make that leap - these additional records and the general absence of any significantly different findings are consistent with Dr. Fantz's findings. Furthermore, the court notes that an ALJ is only required to obtain an updated medical opinion from a medical expert "when additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 1996 SSR LEXIS 3, at *9-10 (July 2, 1996).

Here, ALJ Kays made clear the reasons why he placed significant weight on the opinion and conclusions of Dr. Fantz:

> Because they were based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein. They are well-supported by medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations. Moreover, the opinions are not inconsistent with other substantial evidence of record.

Dkt. 9-1, at 18-19. Therefore, Plaintiff's second assignment of error is without merit and is dismissed.

**IT IS THEREFORE ORDERED** this 19th day of August, 2014, that Plaintiff's appeal is hereby denied.

   s/J. Thomas Marten
J. THOMAS MARTEN,
CHIEF JUDGE